IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

| | |
|---|---|
| LINDA LAUBE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONAL CAMPBELL, et al.,<br><br>Defendants | 2004 JUN 25 P 6: 03<br>)<br>)  ... P. HACKETT, CLK<br>)  DISTRICT COURT<br>)  DISTRICT ALA.<br>)  CIVIL ACTION<br>)<br>)  No. CV-02-T-957-N<br>)<br>)  CLASS ACTION<br>)<br>) |

## MEDICAL SETTLEMENT AGREEMENT

### I. INTRODUCTION

A.   **Plaintiffs.** Plaintiffs in this class action are all women who are now or will in the future be incarcerated in an Alabama Department of Corrections facility. This action was filed seeking declaratory and injunctive relief for violations of their Eighth and Fourteenth Amendment rights. In their complaint, Plaintiffs allege that women with serious medical needs[1] receive constitutionally inadequate medical care.

B.   **Defendants.** Defendants in this case are Donal Campbell, Commissioner of the Alabama Department of Corrections ("ADOC"); Bob Riley, Governor of Alabama; Gladys Deese, warden of Julia Tutwiler Prison for Women; and Mary Carter, warden of Birmingham Work Release. All Defendants are sued in their official capacity. The Plaintiff class and all Defendants are parties to this *Final Medical Settlement Agreement "Medical Agreement"*). The term "Defendants" refers to all these Defendants and their successors, agents, and assigns.

C.   **Scope.** This *Medical Settlement Agreement* is submitted and entered into as a settlement of claims for declaratory and injunctive relief regarding medical care as set forth in paragraphs 101-162, 168-171, and 180 in Plaintiffs' *Second Amended Complaint*, filed on December 18, 2002. The United State District Court for the Middle District of Alabama shall retain jurisdiction to enforce the terms of this *Medical Settlement Agreement* and shall preside over any further proceedings, as necessary. The parties hereby agree to the following terms.

---

[1] For purposes of this Settlement Agreement, "medical" shall refer to physical, mental and dental health care and treatment.

## II. ACCESS TO CARE

A.　**Necessary medical services.** Women incarcerated in an ADOC facility are entitled to all medically necessary services in a timely manner. Medical necessity includes control of pain, prevention of disease, prevention of deterioration of function, and reduction of mortality.

B.　**Daily sick call.** Sick call will be available every week day, excluding medical contractor holidays, to prisoners in all areas of the population at all women's facilities, including general population, segregation units or "lock-up cells", isolation units, and special management units. Within 24 hours of being placed in a lock-box, sick-call slips will be reviewed by a nurse, or higher level practitioner according to appropriate written triage protocols. At least one primary care physician (or psychiatrist, for mental health triage) must be involved in developing these protocols and in reviewing and updating them at least every two years. Each physician involved in this process shall sign and date the protocols (including each update) upon his or her review and approval.

A prisoner requesting medical care shall be seen by a nurse trained in physical assessment (and supervised by a Registered Nurse) or a higher level practitioner within 48 hours after her request has been received by health care staff. Any prisoner who is seen by a nurse two consecutive times for the same symptoms will be referred to a higher level practitioner. This does not *require* two sick calls before a patient can be referred to a higher level practitioner; a registered nurse may make such a referral after a single sick call in accordance with appropriate triage protocols. Prisoners presenting symptoms requiring emergency or infirmary care shall be given immediate medical care. Sick call shall not be conducted between midnight and 6:00 a.m.

C.　**Access to medical care at work release programs.** Women housed in ADOC work release programs shall be provided necessary and timely medical care, including care for chronic conditions, as described in this *Agreement*. Women housed in work release may affirmatively opt out and seek medical care from providers other than the ADOC if the prisoner pays for this care herself.

D.　**Segregation.** Medical staff shall be notified promptly when a prisoner is placed in any type of isolation or segregation cell. If a woman is placed in the "lock-up" cell in Birmingham Work Release at a time when no medical staff are on site, medical staff shall be notified of the placement as soon as medical staff return to Birmingham Work Release Center. Upon notification, medical staff shall review the prisoner's medical record to determine whether her existing medical needs make placement in such a cell inappropriate or require that the prisoner receive extra observation, accommodation, or medical attention during her placement in the cell. Medical staff shall document their review and recommendations in the prisoner's medical record and promptly forward a copy to the supervising correctional officer for appropriate action. Prisoners placed in an isolation or segregation cell at Tutwiler Prison must be monitored daily by health care staff. Women placed in the "lock-up" cell in Birmingham Work Release shall have access to a working

2

intercom system, or shall be monitored by video. Security staff shall conduct visual inspections of the "lock-up" cell at least every 30 minutes, and shall notify medical staff promptly if they suspect that a prisoner in the cell is experiencing a medical problem. Medical monitoring activities must be documented in each prisoner's medical record.

## III. INTAKE

A.    **Intake.** All prisoners entering Tutwiler Prison will be medically screened by a nurse or higher level practitioner within 12 hours of admission. The results of this screening shall be documented in each prisoner's medical record. The minimum components of the screening shall include, but shall not be limited to, the following: documented inquiry into current illness, communicable diseases, symptoms of tuberculosis, alcohol/chemical use/abuse history, allergies, current medications, dental status and screening, mental health problems, obstetrical history, current or past mental health treatment, and chronic health problems; observation of state of consciousness, mental status, appearance, conduct, bodily deformities and ease of movement, signs of trauma, signs of rashes and infections; documented explanation of the procedures for access to medical, mental health and dental services. In addition to explaining the procedures for accessing care, ADOC representatives shall provide all prisoners at intake a written description these procedures that the prisoners may keep. A suicide risk assessment using nationally accepted tools shall be conducted at the initial intake screening. Prisoners who are determined to pose a suicide risk at intake or at any other time during their incarceration shall be referred immediately to a qualified mental health provider for further assessment and treatment and shall be placed under an appropriate watch to prevent suicide.

B.    **Tuberculosis testing.** Tuberculin skin test screening shall be performed in accordance with Alabama Department of Public Health regulations and policies, and said test shall be read by a qualified medical provider within 48-72 hours of administration.

C.    **Initial Physical Exam.** The first physical examination must be completed by a physician, physician assistance or nurse practitioner within seven days of intake. For all women, the initial physical exam shall include a pap test, cervical screening for chlamydia and gonorrhea, serum testing for syphilis, and urine screening for pregnancy. Where possible, the intake history and physical exam should be performed by the same individual.

## IV. CONTINUITY OF CARE

A.    **Continuity of care.** To ensure continuity of care and prevent lapses in medication, the ADOC, through its agents or contractors, shall develop a written policy and implement a procedure that will ensure that upon admission to Tutwiler Prison, there is no disruption in the continuity of medication for persons with a chronic or acute illness. If a woman can identify her medication at intake at Tutwiler, then the medication shall be continued if the prescription for such medication can be verified by a physician or pharmacist. Where such verification is not obtained within 24 hours of intake, the woman must be seen by a physician or physician's assistant within 48 hours of admission who will prescribe

3

necessary medication. Continuity and availability of medication and treatment will be maintained when prisoners are transferred between ADOC facilities, between ADOC and hospital facilities, or between ADOC and local detention centers. The ADOC is not responsible for medical care provided at local detention centers.

B.   **Discharge planning**. For women who are in need of further medical care after discharge from the facility, the ADOC, through its agents and contractors, shall develop and implement a program for discharge planning that includes scheduled follow-up appointments and appropriate referrals to community medical and mental health services. Prisoners on prescribed medication shall be given at least a 10-day supply of their medication upon discharge. For prisoners on medication for serious mental illnesses as defined by ADOC Administrative Regulation 455, the ADOC, through its agents and contractors, shall make best efforts to secure an appointment with the community mental health provider for within 10 days of the prisoner's release. If an appropriate appointment cannot be made for within 10 days of the prisoner's release, the prisoner shall be provided an additional 20 days of her prescribed medication, so long as the prisoner signs a written acknowledgement that the packages containing their medications are not child proof. Prisoners taking HIV medications shall be given at least a 30-day supply of medication on release of HIV medications.

The ADOC, or its agents and contractors, shall collaborate with the local office of the Social Security Administration (SSA) to identify and assist prisoners who may be eligible for federal benefits upon release. Collaboration shall include (1) inviting SSA representatives to provide on-site training regarding their pre-release program, (2) notifying prisoners of the pre-release program (including eligibility requirements) and coordinating with volunteers to help women complete applications, (3) identifying potential pre-release applicants and notifying the local SSA office the names, social security numbers, dates of birth, and anticipated discharge date of these women, and (4) providing relevant medical records.

## V. MEDICAL SERVICES

A.   **Periodic health assessments and examinations**. The ADOC, through its agents or contractors, shall provide periodic health assessments for women prisoners in accordance with NCCHC standards and protocols promulgated by nationally recognized professional organizations. Women prisoners shall receive annual pap smears unless more frequent pap smears are medically ordered. Women prisoners shall also receive periodic mammograms as recommended by the American Cancer Society. Prisoners with abnormal pap smears or mammograms will be informed about the results of their tests and receive appropriate and timely follow-up testing and treatment based on recommendations of the American Cancer Society or ACOG. Women prisoners shall receive a tuberculin skin test annually or more frequently if exposure to tuberculosis is suspected.

B.   **Emergency medical services**. Emergency medical services, including emergency transport service to community hospitals, will be available twenty-four hours a day, seven

days a week through an on-call physician service and/or on-site health care staff.

C.    **Dental services.** All dentists must be currently licensed. Women requiring treatment for relief of acute oral and maxillofacial conditions characterized by trauma, infection, pain, swelling or bleeding which are likely to remain acute or worsen without intervention, must be provided appropriate dental care (including effective infection and pain control) promptly. Women requiring treatment for the control of extensive subacute dental or oral pathology, must be provided dental care within 30 days. This care shall not be limited to extractions or temporary fillings, but also includes restoring carious teeth, extractions, long-term management of peridontal disease, and endontic and prosthodontic procedures needed to retain or restore essential masticatory function. Women requiring ongoing treatment for chronic dental or oral pathology and for the restoration of essential function must be seen within 60 days. For women who are prescribed dental prosthetics such as dentures, impressions for such prosthetics shall be made as soon as it is medically appropriate to make such impressions. The dental prosthetic shall be available within 60 days of impression. All prisoners will have the opportunity to have their teeth cleaned at least once every 24 months. Individuals at risk of periodontal diseases because of age, tobacco use, rate of accumulation of deposits, medication, or medical conditions such as diabetes or HIV infection, may need to be cleaned more often, in accordance with the standard of care for their conditions.

D.    **Infection control.** An infection control program that includes airborne and blood-borne pathogen control plans conforming to Centers for Disease Control ("CDC") regulations, guidelines and recommendations shall be developed and implemented. The program must include appropriate training for correctional and health care staff consistent with these recommendations and guidelines. The airborne and bloodborne pathogen plans must be reviewed and updated every two years or sooner if appropriate.

E.    **Tuberculosis prevention and treatment.** The ADOC, through its agents or contractors, shall promptly diagnose, and treat any individual with a reasonable suspicion of contagious tuberculosis as directed by the Alabama Department of Public Health. Any individual who reports or exhibits symptoms of tuberculosis, including HIV-positive persons, shall be isolated immediately in a properly functioning negative pressure room and have a chest x-ray as soon as possible but in no event later than 96 hours from the reporting of the symptoms. Follow-up treatment and testing shall be conducted according to the recommendations and guidelines of the CDC. Persons with a positive tuberculin skin test result shall be provided a chest x-ray as soon as possible but in no event later than 96 hours of identification of the positive skin test result. Prisoners with chest x-rays that show possible active tuberculosis infection will receive prompt follow-up evaluation and treatment and will be placed in respiratory isolation until active tuberculosis has been ruled out. Preventive treatment for tuberculosis shall be offered to any prisoner with a positive PPD skin test whose anticipated length of stay is greater than two months. Prisoners who receive positive skin tests or suspicious chest x-rays will be counseled about the meaning of these test results. In the event that an active case of TB is identified in the facility, an appropriate contact investigation as directed by the Alabama Department of Public Health

5

will be conducted and all potentially exposed individuals will be provided detailed and thorough educational materials about tuberculosis infection. The Alabama Department of Corrections shall maintain appropriate facilities and/or make appropriate referral outside prison facility for respiratory isolation that are consistent with the recommendations of the CDC.

F. **Chronic illnesses.** The ADOC, through its agents or contractors, shall implement policies and procedures to ensure that the overall standard of care for women with serious chronic medical conditions is consistent with clinical guidelines adopted by the NCCHC as detailed in the *Standards for Health Services in Prisons* and the current clinical guidelines posted on their web-site. For chronic conditions where NCCHC clinical guidelines are not yet available, the ADOC through its agents and contractors, shall provide treatment consistent with nationally accepted clinical guidelines.

For each individual identified with a chronic illness requiring ongoing medical care, a health care treatment plan shall be developed that includes, at a minimum, the following: a written initial evaluation containing short and long range treatment goals by a licensed physician; regular check-ups at least once every 3 months by the chronic care director or higher level practitioner, unless a different period is ordered by a physician; and baseline and quarterly laboratory work and other diagnostics appropriate for the disease. The treatment plan's short and long range goals must be reviewed and updated at least annually in a face-to-face assessment by the attending physician or more frequently as determined by the physician or chronic care director. For patients requiring chronic care, co-payments shall not be assessed for regularly scheduled chronic care clinics.

G. **Hepatitis A, B, and C.** The ADOC, through its agents and contractors, shall make best efforts to secure grant money to ensure that women are counseled, evaluated and vaccinated for hepatitis A and B by October 2005. All women prisoners who are HIV-positive will be vaccinated for hepatitis B.

H. **Prosthesis.** Women requiring a prosthesis will be fitted for such a device within 60 days of prescription. If a prosthesis no longer fits a prisoner, she will be re-fitted for a revised or new prosthesis within 90 days. Prisoners requiring a prosthesis shall be considered chronic care patients for the period necessary to adjust a new, replacement, or refitted prosthesis, and women will receive follow-up care during this adjustment period as medically ordered.

I. **Women's health care.** Women prisoners must be provided treatment for osteoporosis, menstrual abnormalities, ovarian and cervical abnormalities and menopause in accordance with the guidelines of the American College of Obstetricians and Gynecologists . Preventive screening shall be provided in accordance with the American Cancer Society.

J. **Pregnancy.** Pregnant prisoners shall be monitored regularly by a medical doctor or physician assistant with obstetric specialty, in accordance with American College of Obstetrics and Gynecology ("ACOG") guidelines for prenatal care. Pregnant women shall be provided an appropriate diet and supplemental vitamins, and given the opportunity to

request and receive educational information regarding pregnancy. Gestational diabetics shall be treated according to ACOG guidelines. All high-risk pregnancies, as well as women near term, shall be closely monitored and treated. Upon return from the hospital post-delivery, women prisoners will be allowed appropriate bed rest and time for recovery.

K.   **Specialty care.** Patients requiring necessary medical services that cannot be provided in the facility in a timely manner shall be provided timely access to an outside specialist for diagnostic services or medical care. Where approval by the state medical director is required for specialty care, such approval or denial shall be documented. The ADOC, through its agents and contractors, shall make best efforts to ensure that the outside specialist's diagnoses and test results in addition to the specialist's orders for further testing, treatment and diagnostic services are documented in the patient's prison medical record. Orders shall be carried out in the manner prescribed by the specialist, unless a deviation or override is ordered by the attending physician at the facility. Such a deviation or override must be affirmatively medically justified and documented in the medical record of the prisoner. Necessary off-site care shall include follow-care and monitoring prescribed by the off-site specialist.

L.   **End of life care and care for the elderly.** Elderly patients and those in the terminal stages of a disease shall be provided appropriate care and treatment, including pain control, adequate nutrition, accommodations for mental and physical deterioration, and other appropriate palliative care.

M.   **Patient education.** Patient education shall include one-on-one counseling by medical staff at the time care is provided. The ADOC medical provider shall inform patients of the results of any medical tests and assessments within 10 days of receipt of these results in a manner that protects the privacy of the patient, and shall provide appropriate post-test counseling. Prisoners shall not be charged a co-pay for receiving this information. The ADOC, through its agents and contractors, shall also implement a program to make available to patients up-to-date written information in the areas of infectious and communicable disease, and chronic illnesses. Clinical staff knowledgeable about HIV/AIDS shall provide HIV education for all new prisoners. Prisoners who are HIV-positive shall be provided on-going education and confidential counseling about HIV. This education and counseling may be provided in a structured peer education and support program. The ADOC and its medical provider shall cooperate with health organizations, or community organizations working in conjunction with health organizations, to provide prisoners educational materials and services regarding medical conditions, treatment, and related social services.

N.   **HIV/AIDS.** Prisoners who learn they are HIV+ in prison shall be informed of their test results and receive appropriate post-test counseling in a confidential setting. Treatment of HIV/AIDS shall be consistent with Department of Health and Human Services guidelines and recommendations.

O. **Staphylococcus aureus.** The Alabama Department of Corrections, through its agents and contractors, shall continue to develop and implement a program based on FBOP guidelines to treat and to minimize the spread of staphylococcus aureus, including methicillin-resistant staphylococcus aureus (MRSA), and shall work with the Correctional Healthcare Monitor to continually update and improve this program.

P. **Therapeutic medical diets.** Diabetics, as well as patients requiring low salt, renal, low cholesterol, high calorie, or other special diet, shall be provided a medically appropriate diet as approved by a registered dietician. Special medical diets may be ordered by mid- or higher-level medical providers.

Q. **Mental health care.** Defendants' mental health consultant Jane Haddad has conducted on-site audits and reviews of the women's prison facilities to determine mental health housing and treatment space needs, as well as training, programming, reporting, treatment, and staffing needs. Defendants have implemented and shall continue to implement all of Dr. Haddad's recommendations as set forth in her report of her January 15-16, 2004, audit. Within 6 months of final approval of this *Agreement*, Defendants shall begin renovations of Dormitory 2 at Tutwiler Prison to provide for a group room, dayroom, two offices spaces, and a reduction of beds to no more than forty beds. Defendants further agree to use their best efforts to add a nursing station, and six single cells for crisis intervention and intensive psychiatric stabilization, within 3 years of final approval of this *Agreement*. Until these renovations are completed, the ADOC, through its agents and contractors, may but shall not be required to provide 24/7 mental health nursing coverage in the mental health unit. Until these renovations are completed, the ADOC, through its agents and contractors, shall work with Dr. Haddad to determine and implement the measures necessary to ensure that individuals needing intensive psychiatric stabilization and residential treatment levels of treatment receive adequate mental health care.

R. **Mental health auditor.** Dr. Haddad, or another mental health consultant mutually agreed upon by the parties, shall continue in her current capacity as Defendants' mental health consultant, with on-site inspections at least 3 times a year, for the duration of this *Agreement* or 3 months past the date the Residential Treatment Unit becomes fully operational, whichever period is shorter. The mental health consultant shall be paid by the Defendants and be reimbursed for reasonable expenses for the first 2 years, and by counsel for Plaintiffs for the remainder for her tenure. If Dr. Haddad is no longer able to act as mental health consultant, and parties are unable to agree on a mental health consultant within 30 days of her departure, parties will each submit to the Magistrate Judge the names of three suggested consultants, and the Magistrate Judge will select the mental health consultant.

S. **Chronic Mental Illnesses.** The ADOC, through its agents and contractors, shall implement policies and procedures to ensure that the overall standard of care of women with serious chronic mental health conditions is consistent with clinical guidelines adopted by the American Psychiatric Association.

8

T.    **Suicide Prevention and Treatment Program.** ADOC, its agents, and contractors, shall continue to implement an effective and comprehensive suicide prevention and treatment program.

U.    **Self-Injurious Behavior.** Prisoners who engage in self-injurious behavior must receive appropriate and timely mental health intervention including treatment and counseling. Such a prisoner shall also be evaluated by a qualified mental health professional. Only if that professional determines that the behavior was engaged in solely for the purpose of secondary gain may disciplinary action be considered.

V.    **Crisis Intervention and Follow-Up Care.** Together with the mental health auditor, Defendants will write and implement policies and procedures to ensure that mental health crises and urgent requests for mental health intervention are addressed by qualified mental health staff immediately. Following a mental health crisis such as a psychotic episode or suicide attempt, prisoners shall receive appropriate treatment, counseling, and observation as ordered by the treating psychiatrist.

W.    **Depression and Abuse.** Counseling must be available to women prisoners to address depression and to resolve issues associated with victimization from sexual and physical abuse.

X.    **Vulnerable Populations.** The ADOC, working with its mental health provider, shall develop and implement a policy to protect vulnerable prisoners (particularly mentally ill and/or mentally retarded women) from intimidation, harassment, and abuse.

## VI. STAFFING

A.    **General.** ADOC, through its agents and contractors, shall create and fill a sufficient number of qualified permanent medical, nursing, and ancillary health care staff positions (i.e. medical records clerks, lab tech, etc.) to carry out all aspects of this *Medical Settlement Agreement.*

B.    **Licensure and credentials.** ADOC, through its agents and contractors, shall make best efforts to hire primary care physicians who hold a current valid, unrestricted license to practice medicine in Alabama. In the event Defendants cannot find a primary care physician with an unrestricted license, Defendants will seek approval of a Magistrate Judge to hire a physician with a restricted license in order to avoid a lapse in medical coverage. Such a hire shall be temporary, though Defendants may seek re-approval of a Magistrate Judge in extraordinary circumstances. Parties consent to the jurisdiction of a Magistrate Judge, and Plaintiffs will not seek fees, for disposition of this issue.

Nurses must hold current applicable licenses. All other ancillary personnel must meet applicable state regulatory requirements and training standards. Personnel working under a license or certification who are subject to restrictions or conditions imposed by the licensing agency, or who have formal complaints filed against them, must immediately

9

report such restrictions, conditions, or complaints to the Medical Director. Nurses shall not make nursing assessments or decisions outside the scope of their license and training.

C.   **Orientation and training**. Medical and nursing staff must be currently certified in cardiopulmonary resuscitation ("CPR"). All medical and nursing staff who provide sick call shall receive regular training to maintain competence in current methods for diagnosing and treating medical complications associated with acute and chronic illness, including the ability to recognize when referral to a physician, mental health provider, or specialist is necessary. Medical and nursing staff shall also be trained to recognize the signs and symptoms of mental illness, including potential suicide risk and how to react appropriately to such symptoms and risks. All medical and nursing staff shall be provided a copy of this *Agreement*.

D.   **Security staff**. All correctional security staff shall receive regular training regarding HIV, hepatitis and tuberculosis infection, including modes of transmission and universal precautions. All security staff shall have current training in CPR and in Basic First Aid. Security staff shall also be trained to recognize the signs and symptoms of mental illness, including potential suicide risk and how to react appropriately to such symptoms and risks. Security staff will not interfere with the provision of necessary medical care. Security staff shall follow medically ordered restrictions on inmate activity such as bedrest, lifting or work restrictions, bunk profiles and needs for special shoes or clothing.

## VII. PHARMACEUTICALS

A.   **Formulary**. The drug formulary must contain modern pharmaceuticals for diagnoses prevalent in the correctional setting, updated at least every 6 months by a team of providers that includes a primary care physician and psychiatrist. The formulary must include drugs in the following classes, among others: (1) atypical anti-psychotics, (2) proton pump inhibitors, (3) angiotensin receptor blockers, (4) selective serotonin reuptake inhibitors, (5) statins, and (6) antiretrovirals.

B.   **Off-formulary medications**. A formulary waiver process that does not inhibit the timely delivery of medications prescribed for medically necessary conditions shall be implemented.

C.   **Administration**. The ADOC, through its agents and contractors, shall develop and implement a system to provide medications in a timely manner and to track and correct problems with the dispensing and administration of medications. Medication normally stocked in the pharmacy must be made available for the administration of the first dose within 24 hours of intake, and within 24 hours of prescription by the physician. Other medications must be available within 48 hours of prescription. Medication shall be administered at times and in a manner (with food, for example) consistent with prescribing guidelines defined by the Food and Drug Administration or as prescribed by a physician. Prisoners refusing medication must be provided counseling regarding the consequences of incomplete adherence; both the refusal and the counseling must be documented and in-

person. Nothing in this paragraph precludes the forced administration of medication, so long as such forced medication is administered according to current written policy. If medication is not administered to a prisoner, the reason must be documented and signed by the health care staff responsible for medication administration. Correctional staff shall not administer dose by dose medication to prisoners, except at Birmingham Work Release.

There must be general pill call at least three times a day. Management of pharmaceuticals must be in accordance with state and federal law.

D.    **Keep on person medications**. The ADOC, through its agents and contractors, shall develop and implement reasonable criteria, policies, and procedures for prisoners to be issued appropriate medications to keep on their persons.

E.    **Continuity of medication**. The ADOC, through its agents and contractors, shall develop and implement written protocols designed to ensure that there are no lapses in medication.

## VIII. RECORDS AND REPORTS

A.    **Prisoner health care records**. Medical care, including dental and mental health treatment, provided to prisoners shall be accurately documented in each prisoner's medical record. Medical records and health record policies and procedures shall comply with current NCCHC Standards. The records must include all reports received from outside hospitals and emergency rooms, current treatment plans, requests for medical attention, and responses by medical staff. Individual medical records shall be maintained on a current basis, with no more than a 7-day lag for filing new paperwork (except for current MAR's, which must be promptly filed at the end of each month). Patients' health care records shall be available to and used by all healthcare workers in each clinical encounter with the patient.

B.    **Prison health care logs**. The ADOC, through its agents and contractors, shall maintain current and ongoing logs tracking health care requests, all clinical encounters, complaints, grievances, and chronic care clinics, conforming with NCCHC Standards.

## IX. PHYSICAL PLANT

A.    **Infirmary**. The quality improvement committee (see below) shall review the capacity of the Tutwiler infirmary (including the "green rooms" or "psychiatric stabilization units") and provide written guidelines as to types of services appropriate for infirmary care. The infirmary unit shall conform with NCCHC standards including the requirement that all infirmary patients must be within sight or sound of nursing or medical staff at all times. Physician rounds shall be conducted 5 days a week, and an RN or higher level medical provider shall be present at the infirmary each day.

B.    **Medical isolation**. Negative pressure in the medical isolation unit shall be documented daily when in use and monthly when not in use. If there is not a working room or not

11

enough rooms at the prison facility, the ADOC shall make appropriate referral outside prison facility for respiratory isolation.

C.    **Heat and shade.** Defendants shall develop and implement a heat plan that includes policies and procedures ensuring sufficient means of cooling and hydration for heat-sensitive individuals to prevent dehydration, heat exhaustion, heat stroke, and other adverse consequences of heat.

D.    **Sanitation.** All areas housing or temporarily holding prisoners with illnesses, or where prisoners receive medical care or testing, shall be thoroughly cleaned on at least a daily basis or more often if necessary, shall be disinfected between placements, and shall be kept in good physical condition.

E.    **Medical examination rooms.** An adequate number of clinical examination rooms shall be provided, containing an examination table and hand washing facilities to ensure private examinations.

F.    **Equipment.** The ADOC shall provide at Tutwiler prison appropriate and operative equipment, such as automatic defribrillators, to respond to medical emergencies. Staff shall be properly trained to use such equipment. If dialysis is conducted on-site, staff shall be trained in proper methods, and appropriate equipment and space shall be available to perform dialysis. Prisoners who enter prison with respiratory or other medical equipment that is necessary to enable their functioning shall be allowed to use their own equipment or shall be provided appropriate equipment. The ADOC shall ensure that any such equipment receives necessary and timely servicing and replacement. Each facility shall also have a sufficient number of wheelchairs and handicap-accessible bathroom facilities (including toilets, sinks and showers).

## X. QUALITY ASSURANCE

A.    **Ongoing quality management.** A quality management program consistent with nationally accepted standards shall be implemented. A monthly administrative committee shall meet to review audits designed to improve quality of health care. A quality improvement committee that includes a representative of the correctional staff will perform at least quarterly reviews of major components of healthcare at each women's facility, including at least the following: access to healthcare, medication management, nursing services, physician services, access to specialty care, mental health services, pharmacy services, dental services, subcontractor services, infection control procedures, healthcare records, sick call services, intake screening and evaluations, chronic disease services, infirmary care, diagnostic services, discharge planning, and adverse patient occurrences including all deaths. The quality management program must review each of these areas, identify any deficiencies in services to prisoners as well as any staff training needs, and produce corrective plans to address the deficiencies and recommend improvements.

12

Performance in these areas shall be quantified on a quarterly basis, trended, and analyzed for opportunities for improvement. Remedies shall be implemented expeditiously, followed by re-measurement to assess the results of the interventions. The quality management program shall include ongoing assessment of the effectiveness of corrective plans and actions. The staffing of the women's facilities shall be reviewed by Defendants at least every six months and adjustments made to ensure adequate staffing at all times.

B.    **Mortality reviews.** A mortality review of all deaths must be completed within 30 days of each death. The review is to be conducted by a team that includes an independent physician (one who is not the primary care provider at the institution where the death occurred). This review shall consider any and all aspects of custody and health care that may have contributed to the death. The results of this review shall be documented and used to develop interventions to prevent future adverse consequences.

C.    **Correctional Healthcare Monitor.** Parties have agreed on Dr. Michael Puissis as the Correctional Healthcare Monitor ("Monitor") to monitor compliance with this *Medical Settlement Agreement*. The Healthcare Monitor shall be a neutral monitor responsible to the Court. The Monitor shall be paid by the Defendants and be reimbursed for reasonable expenses to a maximum amount agreed to by counsel for parties. The Monitor shall have access to women prisoners and their medical records, to members of the medical and security staff, and to any other information or documents he or she deems necessary to determine compliance with this *Medical Settlement Agreement*. The Monitor shall conduct an initial assessment within 60 days of the Court's approval of this *Medical Settlement Agreement* and make written recommendations regarding deficiencies that prevent compliance with this *Agreement*. The Monitor shall make quarterly on-site inspections of Tutwiler and BWR per year. If the ADOC, its contractors and agents are determined to be in substantial compliance of the *Agreement* for three consecutive inspections in the second year, the Monitor shall make only two on-site inspections per year for the remainder of the *Agreement*. The Monitor may bring additional medical experts as needed to properly evaluate the health services provided to Plaintiffs. The Monitor shall prepare audit reports following each inspection, and items for improvement shall be addressed in a subsequent corrective plan by the institution's quality improvement committee. The Monitor shall provide copies of his or her reports to the Court, Defendants', and Plaintiffs' counsel.

## XI. IMPLEMENTATION AND ENFORCEMENT

A.    **Notice.** The Commissioner of the ADOC and his representatives shall provide a copy of or explain the terms of this *Medical Settlement Agreement* to all of their agents, representatives, and employees in any way connected with medical care of class members, in order to ensure their understanding of the scope and substance of this *Agreement*. Women entering Tutwiler shall be provided an information sheet, mutually approved by all parties, informing them of the existence and material terms of this *Medical Settlement Agreement*. In addition, at least 3 copies of this entire *Medical Settlement Agreement* shall be maintained in the Tutwiler library.

13

B.     **Enforcement.** If the ADOC, its agents or contractors, fail to comply with the terms and conditions of this *Medical Settlement Agreement*, Plaintiffs' counsel may apply to the Court for a finding of contempt or other appropriate relief. Prior to approaching the Court for such relief, Plaintiffs' counsel will bring, in writing, any deficiencies to the attention of the Defendants and the Healthcare Monitor or Mental Health Auditor, as appropriate, and will make reasonable attempts to resolve the issues informally. Issues that cannot be resolved informally between the parties shall be brought to the attention of the Magistrate Judge, who will attempt to mediate a resolution, before Plaintiffs' counsel will move the Court for an Order for Defendants to show cause why they should not be held in contempt.

C.     **PLRA findings.** The parties agree, and the Court hereby finds at this time, and an after independent review, that the prospective relief set forth in this *Medical Settlement Agreement* is narrowly drawn, extends no further than necessary to correct the violations of federal rights set forth in paragraphs 101-162, 168-171, and 180 in Plaintiffs' *Second Amended Complaint*, and is the least intrusive means necessary to correct these violations. The parties agree, and the Court after an independent review hereby finds after an independent review of the *Medical Settlement Agreement*, that this *Agreement* will not have an adverse impact on public safety or the operation of the criminal justice system. Acccordingly, the parties agree, and the Court hereby finds, that this *Medical Settlement Agreement* complies in all respects with the provisions of 18 U.S.C. § 3626(a). This *Medical Settlement Agreement* is not intended to have any preclusive effect except as between the parties in this action. Should the issue of the preclusive effect of this *Medical Settlement Agreement* be raised in any proceeding other than this action, the parties agree to certify that this *Medical Settlement Agreement* was intended to have no such preclusive effect. This *Medical Settlement Agreement* does not resolve, adjudicate, or bar the damages claims of any former, present, or future class members.

E.     **Attorneys fees.** In the event the parties are unable to hereafter resolve by agreement issues relating to Plaintiff's claim for attorneys' fees, Plaintiffs may petition the Court within thirty days of the date on which the Court enters its Order granting the parties' Joint Motion to Adopt Settlement Agreement, for a resolution thereof.

F.     **Class members.** Parties stipulate to the certification of the class of all women who are now or will in the future be incarcerated in an Alabama Department of Corrections facility.

G.     **Modification.** Any party may seek modification of any part of this *Medical Settlement Agreement* for good cause shown. The ADOC, through its agents and contractors, shall continue to implement in a timely manner all parts of this Agreement pending the decision of the Court on any motion for modification.

H.     **Term of Agreement.** This *Medical Settlement Agreement* shall be in effect for four years from the date the Agreement is approved by the Court. Nothing in this *Agreement* is intended to preclude Defendants from moving to terminate the Order in the manner permitted by the Prison Litigation Reform Act.

14

Lisa Kung, GA Bar No. 430302
Tamara Serwer, GA Bar No. 617053
Stephen Bright, GA Bar No. 082075
SOUTHERN CENTER
FOR HUMAN RIGHTS
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Telephone: (404) 688-1202
Facsimile: (404) 688-9440

John A. Russell, III, Esq.
Bar No. ASB-0933-U83J
202 Broad Street
Aliceville, Alabama 35442
Telephone: (205) 373-8714
Facsimile: (205) 373-8894

Gretchen Rohr, GA Bar No. 613518
Holland & Knight LLP
1201 West Peachtree St. NE, Suite 2000
Atlanta, GA 30309
Telephone: (404) 898-8177
Facsimile: (404) 881-8470

George E. Schulz, Jr., FL Bar No.169507
Holland & Knight LLP
50 N. Laura Street, Suite 3900
Jacksonville, FL 32202
Telephone: (904) 798-5462
Facsimile: (904) 358-1872

*Attorneys for Plaintiffs*

William F. Addison,
AL Bar No. ADD002
Alabama Department of Corrections
Legal Division
101 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 353-3890
Facsimile: (334) 353-3891

Ellen Leonard, AL Bar No. LEO008
Charles Campbell,
Bar No. ASB-6423-C52C
Office of the Attorney General
State of Alabama
11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 353-8699
Facsimile: (334) 242-2433

*Attorneys for Defendants*

Bob Riley
Governor, State of Alabama

Troy King
Attorney General, State of Alabama

Donal Campbell
Commissioner, Dept. of Corrections